Filed 12/6/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANGELITA GARCIA DEMONTOYA,<br><br>    Defendant and Appellant. | D079532<br><br><br><br>(Super. Ct. No. SCS282116) |

APPEAL from an order of the Superior Court of San Diego County, Maryann D'Addezio Kotler, Judge. Affirmed.

Katherine Braner, Chief Deputy Public Defender, Daniela Reali and Troy A Britt, Public Defenders, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

Penal Code[1] section 1473.7 permits withdrawal of a guilty plea when the defendant establishes "prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (a)(1).) In 2018, section 1473.7 was amended and became effective January 1, 2019. (Stats. 2018, ch. 825, § 2.) Among other things, the 2018 amendment added the following sentence to the end of subdivision (a)(1): "A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (§ 1473.7, subd. (a)(1).)[2]

In the instant matter, Angelita Garcia DeMontoya appeals an order denying a motion under section 1473.7, filed in 2021, in which she sought to withdraw her guilty plea to the charge of assault with a deadly weapon (§ 245, subd. (a)(1)) that was entered in 2016. The superior court denied that motion on the grounds of collateral estoppel. The court found that DeMontoya had filed a section 1473.7 motion in 2018 and that motion, which was denied, involved identical issues as the 2021 motion.

DeMontoya argues that the superior court erred in denying her 2021 motion because the 2018 amendment to section 1473.7 created a new right, which did not exist when she filed her first motion in 2018. However, DeMontoya overlooks the fact she appealed the order denying her 2018 motion, and this court affirmed that order in early 2019, considering the impact of the 2018 amendment on DeMontoya's claims and independently concluding that DeMontoya's first motion failed even under the 2018 amendment. (See *People v. DeMontoya* (Apr. 24, 2019; D073954 [nonpub. opn.].) DeMontoya did not challenge our conclusion through a petition for rehearing or a petition for review with our high court.

---

[2] Courts have disagreed whether this additional sentence provided a new right or merely clarified the existing statute. (Compare *People v. Ruiz* (2020) 49 Cal.App.5th 1061, 1067 (*Ruiz*) [a new right] with *People v. Camacho* (2019) 32 Cal.App.5th 998, 1006-1008 (*Camacho*) [a clarification].)

As such, whether the 2018 amendment created a new right does not matter for purposes of our analysis here. We specifically considered that amendment during DeMontoya's appeal of the order denying her 2018 motion. Thus, DeMontoya's second motion under section 1473.7 does not involve any new rights that were not considered in her previous motion. In addition, she contends that her 2021 motion involves new facts. We conclude that claim is without merit as well. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We take the facts and the procedural background regarding DeMontoya's first motion for relief under section 1473.7 from our previous opinion, *People v. DeMontoya*, *supra*, D073954.

*"Factual Summary*

" . . . . DeMontoya rented a home from Landlord, who lived in in a residence behind the main house. On the day of the incident, Landlord came home from her job cleaning houses and DeMontoya told her to come into DeMontoya's residence. When Landlord walked into DeMontoya's bedroom, DeMontoya was with two other women whom the Landlord did not recognize. DeMontoya told Landlord to sign a check for $ 250,000 and the three women blocked Landlord from exiting the bedroom.

"During an ensuing struggle, DeMontoya placed a machete against Landlord's neck and said 'you better sign or else.' DeMontoya was on top of Landlord, who was screaming while the women were attempting to tape Landlord's mouth shut. Landlord attempted to exit the bedroom through an open window, and DeMontoya's daughter and another witness observed DeMontoya holding onto her. One of DeMontoya's daughters called the police and helped Landlord exit through the window.

3

"When police officers searched the bedroom, they found crumpled packaging tape. The officers later seized a machete DeMontoya's daughter found under the bed. Landlord had three marks on the right side of her neck, consistent with an object similar to a machete being pushed against her skin. She also had numerous bruises on her arms and a scratch on her forearm that was bleeding.

"*Charges and Guilty Plea*

"DeMontoya was charged in a complaint with three counts: (1) assault with a deadly weapon (§ 245[, subd.] (a)(1)); (2) attempted robbery (§§ 211, 664); and (3) false imprisonment by violence, menace, fraud, and deceit (§§ 236, 237[, subd.] (a)). The complaint alleged that in committing each count, DeMontoya personally used a dangerous and deadly weapon ('a machete/axe'). (§§ 1192.7, 12022[, subd.] (b)(1).)

"In January 2016, DeMontoya agreed to plead guilty to the assault with deadly weapon count (§ 245[, subd.] (a)(1)) and to admit the personal use enhancement, in exchange for the prosecutor's agreement to dismiss the two other counts and for the court to determine the sentence (with a maximum punishment of the four-year upper term on the assault offense).

"Before the court accepted this plea, DeMontoya signed and initialed the guilty plea form. Part 7d. of the form states: 'I understand that if I am not a U.S. citizen, this plea of Guilty/No Contest may result in my removal/deportation, exclusion from admission to the U.S. and denial of naturalization. Additionally, if this plea is to an "Aggravated Felony" listed on the back of this form, then I **will** be deported, excluded from admission to the U.S., and denied naturalization.' (Boldface in original.) DeMontoya initialed the form next to these statements.

4

"The back of the form states: **'ANY CONVICTION OF A NON-CITIZEN FOR AN "AGGRAVATED FELONY" AS DEFINED UNDER 8 U.S.C 1101(a)(43), <u>WILL</u> RESULT IN REMOVAL/DEPORTATION, EXCLUSION, AND DENIAL OF NATURALIZATION.  [¶] "AGGRAVATED FELONIES"** include, but are not limited to, the following crimes . . . .'  The form then lists 20 separate crimes or categories of crimes, including:  'ANY CRIME OF VIOLENCE*  [¶]  (Includes any offense that has as an element the use, attempted use, or threatened use of physical force against the person . . . of another, <u>or</u> <u>any</u> <u>felony</u> offense that, by its nature, involves a substantial risk that physical force against the person or property of another may be used . . . .'  The bottom of the page contains the notation regarding the asterisk (*), stating:  'Where the term imposed is at least one year, whether or not any or all of that term is stayed or suspended at the time of sentencing.'

"DeMontoya's attorney (Albert Arena) signed the guilty plea form, stating he explained the entire form to DeMontoya and discussed the charges, possible defenses, and plea consequences, 'including any immigration consequences.'

"At the change of plea hearing, the court (Judge Gary Haehnle) questioned DeMontoya and confirmed her understanding of the contents of the form, including that the form had been translated into Spanish.  Of relevance here, the court stated to DeMontoya:  'Also understand that if you are not a U.S. citizen, this plea of guilty *would* result in you being deported, excluded from admission to the U.S., and denied naturalization?'  (Italics added.)  DeMontoya responded, 'Yes.'

"At the conclusion of the hearing, Judge Haehnle accepted the change of plea, finding DeMontoya voluntarily and intelligently waived her

5

constitutional rights; her plea was freely and voluntarily made; she understood 'the nature of her charges, the consequences of her plea and admission'; and there was 'a factual basis for the plea.'

"In preparation for sentencing, a probation officer interviewed DeMontoya, who expressed remorse. DeMontoya said she became upset after Landlord sprayed bleach on her face during an argument (a bottle of bleach was found in the bedroom). She said she placed the machete on Landlord's neck to scare her, but she had no intention of hurting her. The probation report reflects that DeMontoya has no criminal history, does not have alcohol problems, and has never used controlled substances. The probation officer concluded the offense 'was probably an isolated incident,' but that DeMontoya was 'clearly out of control' and 'needs to participate in anger management in order to prevent further violent outbursts.'

"The probation officer found DeMontoya was presumptively ineligible for probation (§ 1203[, subd.] (e)(2)) based on her guilty plea to assault with a deadly weapon, but recommended probation under the rule that probation may be granted in 'unusual cases where the interests of justice would best be served' (§ 1203[, subd.] (e); see Cal. Rules of Court, rule 4.413). The officer recommended three years of formal probation.

"*Sentencing Hearing*

"At the sentencing hearing, defense counsel urged the court to grant DeMontoya probation based on DeMontoya's family and community support and lack of criminal record, and the fact the probation officer found the crime to be an 'isolated incident.'

"Landlord then spoke at length about her terror during the incident and its long-term emotional and psychological impact on her life. She

6

strongly urged the court to impose a lengthy sentence, stating that she has 'no peace of mind . . . neither day or night.'

"The prosecutor asked the court to impose the three-year middle term, emphasizing the seriousness of the offense and the strong evidence supporting the crime (including the 'crumpled up tape,' the machete, and the witness statements). The prosecutor said: '[B]ased on the circumstances, the machete to the neck, holding the lady basically hostage in that room, trying to bind her up and causing the kind of emotional impact that is obvious in this case, . . . the appropriate sentence is the middle term.'

"In response, DeMontoya's counsel noted that the guilty plea 'will have a dramatic impact on her immigration status,' stating: 'So if the victim is looking for punishment, it's a good strong likelihood that Ms. DeMontoya will not be able to enjoy all the United States has to offer. She is mostly likely going to be deported to Mexico. Perhaps the Court could stay a prison term and allow Ms. DeMontoya to prove to this Court that indeed this is a one time isolated incident.'

"After considering the arguments, Judge Haehnle imposed the two-year lower term on the section 245[, subd.] (a)(1) count. The court first directed its comments to Landlord, explaining that its discretion was limited because of the need to consider various mitigating factors, such as DeMontoya's age and lack of criminal record, but the court also made clear it understood the dangerousness of DeMontoya's conduct. The court stated:

> " 'Wow, this is a very serious matter. . . . [I]t really hit me today how serious this was once I read [Landlord's] letter. And I remember when we discussed this case I thought it was serious, I thought there were some things that sounded very out of control on Ms. DeMontoya's behalf.
>
> " 'But then when I [sat] down and read all this and put it all together, this is a case that based on what I read I don't

agree with probation. I don't think probation is appropriate in this case . . . .

" 'For a one time out of character response, this was . . . pretty extreme. It involved the use of a weapon. It involved the use of tape. It involved [Landlord] having to dive out a window to save her life from these people. It involved robbery, basically, I mean, there was extortion, give us money. I mean, this has [it] all. This has violence and all kinds of things added into it.

" 'And I think . . . Ms. DeMontoya . . . represents a danger to the community, and I don't think probation is appropriate in this case. [¶] . . . [¶]

" '[Additionally], she is presumptively ineligible for probation. [¶] And I have to find a circumstance in the interest of justice to find that she is eligible for probation, and I have not been able to find that. [¶] . . . So probation will be denied.

" 'Now when I look at the term in prison that I have to give her in this case, I do consider the fact that she is 46. She has no prior record. *She will suffer a dire consequence of being deported from the country back to Mexico*. And I don't know how long it has been since she's been there and if she has any means back there of support. Her family is here, which is going to put a burden on them since she won't be there.

" 'So I weigh that fact against the serious nature of this, and . . . I believe that the low term is appropriate in this case of two years.' (Italics added.)

"DeMontoya completed her sentence in September 2016, and then was immediately transferred to immigration custody at Otay Mesa Detention Center.

"*DeMontoya's Section 1473.7 Motion*

"In March 2018, DeMontoya moved to vacate her conviction and withdraw her guilty plea under section 1473.7[, subd.] (a)(1). At the time, she

8

remained in immigration custody.  She asserted three grounds for the motion: (1) her defense counsel did not explain that by pleading guilty to section 245[, subd.] (a)(1) without any limitations on her sentence, 'she was signing up for the possibility of certain deportation'; (2) the prosecutor failed to ' "consider the avoidance of adverse immigration consequences [of DeMontoya's] plea [when trying to] reach a just resolution" ' (see § 1016.3); and (3) DeMontoya's attorney provided constitutionally ineffective assistance by failing to propose a sentencing cap of 364 days on the section 245[, subd.] (a)(1) count, which would not have triggered mandatory deportation.

"On the third ground, her counsel argued that DeMontoya 'could have pled guilty to both counts 1 [assault with a deadly weapon] and 3 [false imprisonment], with an agreement that her sentence would not exceed 364 days on count 1.  Such a resolution would have included a felony conviction on count 3, and could even have resulted in a prison sentence on that count, but would have avoided the potential immigration consequences of a prison sentence on count 1.'  She argued the errors were prejudicial because they affected her ability to 'meaningfully' understand the immigration consequences of her plea and conviction.

"DeMontoya submitted her supporting declaration stating she is currently in immigration removal proceedings and the immigration court appointed an attorney to represent her 'due to [her] severe mental disability.'  She said she has been diagnosed with depression, posttraumatic stress disorder, and anxiety.  She said she has lived in the United States since 1984 when she was about 13 years old, and became a legal permanent resident in 2007.  Both her daughters were born in California and she has a grandson.

9

"With respect to her assertion that she did not understand the immigration consequences of her plea, DeMontoya said her plea counsel (Arena) was aware she was a legal permanent resident, and he told her the case 'would be bad for immigration, but he did not tell [her] exactly what the consequences would be.' She also said:

> " 'I did not know that a person who is a permanent resident can also be deported . . . . [¶] . . . Mr. Arena told me that if I did not accept the plea offer, I could get life in prison. He told me that if I accepted the plea offer, it was likely that I would receive a time-served sentence. Mr. Arena did not tell me until after I was sentenced that I was going to be deported and that I would need an immigration attorney. Mr. Arena also did not tell me that I would have to be detained without bail during my immigration case because of the conviction.
>
> " ' . . . If I had known that my conviction would almost certainly lead to my deportation, I would not have pled guilty. If I had to, I would have agreed to spend more time in jail to avoid being deported. I have been in immigration detention since September 2016, which is longer than I spent in jail for the criminal case.'

"She also submitted the declaration of her appointed immigration attorney, who detailed DeMontoya's severe mental health problems, including a recent suicide attempt. DeMontoya's immigration attorney also explained the mandatory deportation consequence of her guilty plea and the fact that deportation would not have been mandatory if she had pled to less than 365 days on the section 245[, subd.] (a)(1) charge:

> " '[DeMontoya's] two-year prison sentence for violating section 245[, subd.] (a)(1) . . . makes that conviction a categorical aggravated felony. This means that [DeMontoya] is definitely removable based on this conviction, and there [is] no viable argument against removability. . . . Because the Immigration and Nationality Act requires a sentence of more than one year for a crime of

violence to qualify as an aggravated felony, [DeMontoya] would not be removable if she had received a sentence of less than one year for this offense. She also would not be removable if she had received a total sentence of two years, but no more than 364 days on any one count.

" ' . . . Although [DeMontoya] has been a permanent resident for nearly 11 years, she is not eligible for any relief from removal because this conviction is an aggravated felony. . . . If [DeMontoya] had been convicted of an offense that was not an aggravated felony, she would be eligible for a form of relief known as cancellation of removal, which would allow [DeMontoya] to maintain her status as a permanent resident. . . .

" ' . . . [DeMontoya] is also ineligible for asylum and for withholding of removal, although there is a high probability that she will be confined to an inhumane psychiatric hospital if she is deported to Mexico. . . .'

## "*Evidentiary Hearing*

"At the hearing on DeMontoya's section 1473.7 motion, DeMontoya's former defense counsel (Arena) was the only witness. Arena testified he has been practicing criminal law for 34 years and met with DeMontoya at least three times with a certified Spanish interpreter during the representation. He felt the prosecution had a 'very strong' case on the charges of assault with a deadly weapon and false imprisonment. He noted that DeMontoya's daughter, who had worked for the San Diego County Sheriff's Department, called 911 during the incident to report that her mother 'was attempting to kill somebody.'

"Arena said he tried to convince the prosecutor to allow DeMontoya to plead guilty only to the false imprisonment charge, but the prosecutor was unwilling to agree. Arena said during these negotiations, the prosecutor handed him an amended complaint, 'indicating he was going to file' the complaint and add a charge of kidnapping for extortion or pecuniary gain

11

(§ 209), which carried a potential life term.  Arena said this proposed amended complaint 'was a game-changer for us in how we approached this case,' because he was certain the prosecutor was serious about adding the kidnapping charge. He said that although the prosecutor ultimately did not file the amended complaint, the possibility caused him substantial concern because his research disclosed the facts could potentially support this charge.

"Arena testified that when he was trying to settle the case, he was 'very, very much aware;' of DeMontoya's permanent resident immigration status and that avoiding deportation was very important to DeMontoya.  He said 'we were talking about immigration consequences throughout the entire case, and "one of [his] goals" ' was to resolve the case in a way that would avoid deportation.  Arena said he discussed with the prosecutor that DeMontoya would have immigration consequences from any plea.  Arena also said he told DeMontoya and her daughter that they should speak to an immigration attorney.

"Consistent with his usual practice 'to err on the side of caution' and to inform a defendant of the most severe possible consequences, Arena told DeMontoya she would be deported if she pled guilty to the section 245[, subd.] (a)(1) charge because it was a crime of violence, and DeMontoya understood 'deportation was going to happen.'  Arena said:  'When we finally settled [on the guilty plea to] the [section] 245 [count], I said "Look.  You can't risk the life term.  You can't roll the dice out.  We will have to settle for the 245." '  Arena also told DeMontoya that the court could select the probation option, and if the court selected this option, 'it would be extremely helpful' to later immigration issues.  He told her she had a ' "good shot at probation," ' but that ' "you will be deported." '  Arena said:  'Because of facing the

12

possibility of a life term on the [kidnaping charge,] I told her it was better to be free in Mexico than doing at least seven years in state prison.'

"When asked whether he was aware of any different immigration consequence if she received a sentence of 364 days on the assault charge, Arena said 'there is no guarantee' that a defendant can avoid deportation with any plea deal and that 'my position [was] and remains today is that any chance you may have, you have a best chance with probation and not state prison . . . .'

"On cross-examination, Arena testified he was aware that a 'nonserious and nonviolent [crime] has significant benefits to the immigration process and may prevent someone from being deported.' He was not sure whether the same was true for aggravated felonies with probation.

"At the conclusion of Arena's testimony, DeMontoya's current counsel argued that Arena provided constitutionally ineffective assistance because he was unaware that a less-than-one-year sentence on the section 245[, subd.] (a)(1) count would not result in mandatory deportation. DeMontoya's counsel asserted: 'telling someone that there is no way to avoid deportation, where there is a way to avoid deportation, is giving that person an inaccurate picture of their options.' DeMontoya's counsel argued that one potential unexplored proposal was for DeMontoya to plead to 'both Count 1 and Count 3, but with a cap of 364 days on Count 1,' noting this plea would have avoided the mandatory deportation consequence.

"In response to the court's question about whether there was any evidence the People would have accepted this proposal, defense counsel acknowledged she had not subpoenaed the prosecutor who negotiated the plea agreement. But counsel argued the court could infer the prosecutor would have been willing to accept a plea agreement with a 364-day

13

sentencing cap on the section 245[, subd.] (a)(1) count because he had agreed to allow the court to determine sentencing, including the possibility of probation.

"The prosecutor at the section 1473.7 hearing did not challenge DeMontoya's interpretation of immigration laws with respect to the effect of a greater-than-one-year sentence on the section 245[, subd.] (a)(1) conviction, but argued there was no basis for relief because there was no evidence the prosecutor in DeMontoya's criminal case would have accepted a plea with a stipulated 364-day (or less) sentence.

*"Court's Ruling*

"After considering the evidence and arguments, the court (Judge Stephanie Sontag) denied the motion. The court first rejected DeMontoya's assertion she was unaware of the mandatory deportation consequence of her plea. The court said: 'She was told she was going to be deported. Whether she assimilated that fact or not, she was told she was going to be deported several times. So . . . you can't use that argument.'

"But the court found the evidence supported DeMontoya's claim that Arena did not consider the impact of the section 245[, subd.] (a)(1) sentence length on DeMontoya's deportation exposure. The court said Arena was '[c]learly . . . unaware that a sentence of 364 or less would avoid deportation,' and instead followed his 'custom and practice' to warn about the 'worst possible consequences.' The court said it was 'a little haunted' by Arena's failure to consider the one-year rule because it precluded him from 'present[ing] alternatives to the district attorney's office . . . that . . . could result in a different outcome.' But the court ultimately concluded the failure to present the alternative was not prejudicial within the meaning of section 1473.7. The court stated in part:

14

" 'I'm going to deny your motion finding that you haven't presented proof that there is prejudicial error damaging the moving party's ability to understand and defend against or knowingly accept the actual or potential adverse immigration consequences.

" '[I]n the totality of the circumstances, I don't think there has been evidence presented that there would be a difference in outcome that—although I think you have presented evidence that it's pretty disturbing that the alternatives weren't considered, and they should have been. That evidence is here. I just don't have any evidence . . . that it would have made a difference in this case, and I think there needed to be evidence of that, at last some—beyond a possibility. . . .

" 'So it's a close call, but you have the burden so it's one of those calls. That's what I'm deciding. [¶] . . . [¶]

" ' . . . I needed some evidence . . . that those different pleas would [have been] entertained or considered, and I don't have that. [¶] . . . I have the [kidnapping charge] being possibly filed with a life top. I have the [prosecutor saying] I'll [accept] a plea to the most serious offense that is currently charged . . . . I will not agree to a probationary sentence, but I won't preclude the judge from doing that. [¶] So you do have that evidence that the district attorney was not insisting on a stipulated prison sentence, but on the other hand did not stipulate to probation either . . . .' "

*DeMontoya's First Appeal*

In DeMontoya's first appeal, the People did not challenge and we concurred that only a one-year (or more) sentence under section 245, subdivision (a)(1) would trigger mandatory deportation. We also agreed with the superior court that DeMontoya's attorney (Arena) did not inform her of the distinction between a one year and less-than-one-year sentence for purposes of mandatory deportation; Arena did not consider this legal principle when advising DeMontoya and negotiating the plea; and

15

DeMontoya was not otherwise aware of the relevance of the one-year sentence length on the immigration consequences of her plea. We further concluded that a failure to investigate an immigration-neutral alternative disposition in plea bargaining can constitute a ground for deficient performance to support relief under section 1437.7. (*People v. DeMontoya, supra*, D073954.)

However, we agreed with the superior court that DeMontoya did not meet her burden to show prejudice under section 1473.7. To this end, we explained:

> "In this case, there are no *facts* in the record showing that DeMontoya's attorney could have successfully brokered a more favorable immigration disposition. The sole contemporaneous evidence on this subject—Arena's testimony—supports a contrary conclusion: that he attempted to convince the prosecution to accept DeMontoya's plea to the false imprisonment charge, but the prosecutor would not agree to this, and instead made clear his intention to file an amended pleading that would add the much more serious crime of kidnapping that had a potential life term. Likewise, Arena's testimony reflects that DeMontoya was not willing to risk going to trial because there was no reasonable basis to support that she would have obtained a more favorable immigration outcome at trial and/or that she was willing to be exposed to the kidnapping charge."

(*People v. DeMontoya, supra*, D073954.)

In addition, we observed that DeMontoya did not call the prosecutor, who could have provided relevant information regarding his willingness to consider a 364-day stipulated sentence on the section 245, subdivision (a)(1) charge. And, at the evidentiary hearing, DeMontoya's counsel conceded that she could have subpoenaed the prosecutor to testify but admitted that she did not do so.

16

Nevertheless, DeMontoya argued the prosecutor's testimony was unnecessary because the plea deal the prosecutor ultimately agreed to did not contain a fixed sentence. Thus, she argued it could be inferred, based on the plea agreement, that the prosecutor would have agreed to a sentence on the assault count not to exceed 364 days. We rejected this argument as speculative, observing that the prosecutor was aware DeMontoya was presumptively ineligible for probation and that it was unlikely that a court would find DeMontoya had met her burden to rebut that presumption, given the seriousness of the offense and the severe emotional trauma suffered by the victim. In addition, the prosecutor was prepared to file an amended complaint charging an offense punishable by a life term. Also, the plea deal allowed the prosecutor to argue for a prison term (which he did), and it was undisputed that the prosecutor and defense counsel discussed the immigration consequences of the plea deal, and the prosecutor was unwilling to accept a plea to false imprisonment that would have been more immigration-favorable. (*People v. DeMontoya*, *supra*, D073954.)

In affirming the superior court's order, we reiterated that DeMontoya was "repeatedly informed that she would be deported as a result of her plea and she pled guilty with full knowledge of the adverse immigration consequences. She was aware that the prosecutor was ready to file an amended complaint with a much more serious charge" and her attorney's investigation showed some factual support for the charge. DeMontoya was offered a favorable plea agreement that left open the possibility of probation, a disposition that would not carry a mandatory deportation consequence. However, there was no evidence that the prosecution would agree to a different plea deal, even if the deal would include a 364-day stipulated sentence. In other words, we concluded that "DeMontoya did not meet her

17

burden to show prejudicial error, i.e., that she would not have accepted the plea agreement had she been aware of the immigration-law distinction between a one-year and a less-than-one-year sentence on the assault count." (*People v. DeMontoya*, *supra*, D073954.)

Moreover, because we considered DeMontoya's appeal in early 2019, we explicitly noted the change in section 1473.7, indicated that the last sentence in subdivision (a)(1) was added by 2018 legislation and became effective January 1, 2019 (Stats. 2018, ch. 825, § 2), assumed its applicability, and concluded it did not change the result in the appeal. (*People v. DeMontoya*, *supra*, D073954.)

*DeMontoya's Second Motion For Relief Under Section 1437.7*

In her 2021 motion to withdraw her guilty plea, DeMontoya argued that she was entitled to relief because there was a reasonable probability that (1) she would not have pled guilty if she had meaningfully understood the negative immigration consequences of her plea and conviction and (2) she had been accurately informed about alternative pleas that could avoid deportation, but (3) without such advice, she had been unable to knowingly accept the negative consequences of her plea. She also argued that she had been "suffering from a mental health diagnosis, which was also an additional 'prejudicial error' that contributed to her inability to 'meaningfully understand' the immigration consequences of her plea." DeMontoya argued that she was not collaterally estopped from bringing a second section 1473.7 motion because the 2018 amendment to the statute had "provided for a different standard for challenging and prevailing based on immigration advisement[ ] errors."

In support of her motion, DeMontoya submitted her 2018 declaration, a 2017 letter from a clinical psychologist who had evaluated DeMontoya at the

18

request of a staff attorney with the Immigration Justice Project, and a 2020 declaration from an attorney with experience in criminal defense and immigration law who suggested alternative pleas that could have been negotiated to avoid deportation.

In an addendum to her motion, DeMontoya alerted the court to our high court's recent opinion in *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), which addressed the prejudice standard to be applied when ruling on a section 1473.7 motion. DeMontoya also claimed that a new psychological report showed that DeMontoya's mental health issues could have impacted her understanding of the immigration consequences of her plea.

In their opposition, the People argued that DeMontoya should be collaterally estopped from relitigating her section 1473.7 motion. They noted that this court had affirmed the order denying DeMontoya's first motion, brought in 2018, and had specifically stated that the 2018 amendment to section 1473.7 did not change the outcome.

Before the court entertained oral argument on DeMontoya's motion, it informed the parties that its tentative ruling was to deny the motion "based on collateral estoppel." The court explained "that the case law [wa]s very clear that Ms. DeMontoya already had this motion, that the exact same issues were litigated." The court also made clear that it did not believe the change in section 1473.7 (which the court interpreted as a clarification not a modification) only stated that a defendant did not have to show ineffective assistance of counsel to prevail on a motion. Moreover, the court noted that DeMontoya's first section 1473.7 motion was not denied based on her failure to prove ineffective assistance of counsel. Finally, the court observed that this court addressed the 2018 amendment to section 1473.7, subdivision (a)(1) in affirming the order denying DeMontoya's first motion.

19

In response to the court's tentative ruling, DeMontoya's counsel argued that the issues in the first motion and the current motion had to be identical for collateral estoppel to apply. She then maintained that the amendment to section 1473.7 "completely change[d] the standard by which a court is to review [the] motion."

The court disagreed that the amendment changed the standard. Rather, the amendment merely made clear that to prevail on a motion under section 1473.7, a defendant did not have to prove ineffective assistance of counsel. The court explained that, even with the amendment, DeMontoya still had to show by a preponderance of the evidence that she had been prejudiced. The court emphasized that, after reviewing the transcript of the underlying hearing of the first motion, it was clear the previous court did not deny the motion because DeMontoya did not prove her counsel was constitutionally ineffective.

DeMontoya's counsel disagreed, arguing that the court focused on the ineffective assistance of counsel standard and denied DeMontoya's first motion for that reason. In addition, she claimed that this court did not consider the amended statute in addressing DeMontoya's previous appeal in *People v. DeMontoya*, *supra*, D073954. DeMontoya's counsel continued to claim that DeMontoya should be permitted to bring her second motion because it was based on new law and facts.

The superior court ultimately denied the motion, explaining:

> "The Court finds that there are certain factors, threshold requirements that the Court has to find in order to collaterally estop Ms. DeMontoya from relitigating this motion. And the first is that the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. I find that it is exactly the same issue.

20

"The Court also has to find that this issue must have been actually litigated in the former proceeding, and it is quite clear that it was actually litigated.

"Third, the Court has to find that it has been necessarily decided in the former proceedings. It was decided that she did not meet her burden of showing prejudicial error by a preponderance of the evidence and the appellate court affirmed that.

"Fourth, the decision must be final on its merits; it was. It was both decided by the lower court, affirmed by the appellate court.

"And finally, the party has to be the same party, and obviously she is.

"I do not find that—as the appellate court stated, I do not find that the change in the law which was a clarification, it did not change the burden, it did not change any of the issues that were litigated. It would—remains to be the exact same issue under the exact same standard. And so based on that, the Court is at this time going to deny the motion."

## DISCUSSION

Collateral estoppel prohibits relitigation of issues argued and decided on their merits in prior proceedings. (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341-343.) The doctrine traditionally applies when four requirements are met: " 'First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.' " (*People v. Gonzalez* (2021) 65 Cal.App.5th 420, 433.)

21

Here, DeMontoya contends that the superior court erred in finding collateral estoppel applied to her second motion for relief under section 1473.7 because the second motion was not identical to the first. Specifically, she claims there was a change in the law between the time she brought the first and the second motions. In addition, DeMontoya insists her second motion was based on new facts that were not litigated in her previous motion. We address these contentions in order.

DeMontoya points out that the 2018 amendment to section 1473.7 became effective January 1, 2019. The specific change to the statute on which DeMontoya relies is the added last sentence of subdivision (a)(1): "A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (§ 1473.7, subd. (a)(1).) Relying on *Ruiz*, *supra*, 49 Cal.App.5th 1061 and *People v. Jung* (2020) 59 Cal.App.5th 842 (*Jung*), DeMontoya maintains that the amendment was a change in the law, and thus, collateral estoppel does not prohibit her second motion, which was brought after the effective date of the amendment while her first motion was filed before. In other words, DeMontoya's second motion relied on the 2018 amendment but the first motion did not.

In *Ruiz*, the defendant filed a motion arguing that her conviction should be vacated because the trial court did not ensure that she had been adequately warned before she pleaded guilty that her conviction " '*may result in deportation.*' " (*Ruiz*, *supra*, 49 Cal.App.5th at p. 1064.) Although the motion included a reference to section 1473.7, it primarily was based on the general advisement set forth in section 1016.5. (*Ruiz*, at pp. 1064-1065.) The superior court denied the defendant's motion because the record showed that she had been advised consistent with the language in section 1016.5 that "her conviction '*may have*' negative immigration consequences." (*Ruiz*, at p. 1064.)

22

After the 2018 amendment to section 1473.7, the defendant filed a second motion and argued that she had not been " 'advised by her attorney that, because of her plea in this case, *she would be rendered permanently ineligible to ever become a legal resident of the United States.*' " (*Ruiz, supra,* 49 Cal.App.5th at p. 1064.) The superior court determined that it lacked jurisdiction to hear the defendant's second motion, finding "the current motion was an untimely 'motion for reconsideration' of the prior 2017 motion." (*Id.* at p. 1065.)

On appeal, the defendant claimed that she was not precluded from bringing her motion under section 1473.7 because "1) her prior counsel ineffectively brought the 2017 motion on the ground that the 1991 advisement did not meet the requirements of the inapplicable section 1016.5 advisement provision; 2) 'no motion was truly brought under Section 1473.7'; and 3) the 'prior motion was denied pursuant only to Section 1016.5.' " (*Ruiz, supra,* 49 Cal.App.5th at p. 1068.) The appellate court concluded that the defendant's second motion was not barred by collateral estopped "[b]ecause it involve[d] different issues than [her] prior motion." (*Id.* at p. 1069.) The court rejected the People's argument that "the citation to section 1473.7 in the 2017 motion" prevented the defendant from proceeding on the 2019 motion. (*Ibid.*) Rather, the court noted that the defendant had filed her original motion when the 2017 version of section 1473.7 had been in effect. (*Ruiz*, at p. 1069.) However, the 2018 amendment had "modif[ied]" section 1473.7 and "made it easier to retroactively challenge convictions based on the ground that the defendant was not properly advised of the immigration consequences" by "eliminat[ing] the *Strickland*[3]

---

3      *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).

23

requirements." (*Ruiz*, at pp. 1066-1067.) The court further explained that the "Legislature knew defendants, like Ruiz, had been misadvised on immigration consequences, yet they were losing section 1473.7 motions to vacate convictions in 2017 and 2018." (*Id.* at p. 1067.) The court thus concluded that, with the 2018 amendment, the Legislature "intended to change the law to give defendants a *new right* to prevail using an easier new standard to retroactively challenge invalid prior convictions." (*Id.* at p. 1067; but see *Camacho*, *supra*, 32 Cal.App.5th at pp. 1006-1008 [concluding the 2018 amendment to section 1473.7 merely clarified existing law].)[4]

Yet, to resolve the issue before us, we need not decide whether the 2018 amendment to section 1473.7 created new rights as described in *Ruiz* or clarified existing law as stated in *Camacho*. In considering DeMontoya's previous appeal of her first motion for relief under section 1473.7, we explicitly considered the 2018 amendment to the statute and independently determined it did not change the result in that case. (See *People v. DeMontoya, supra*, D073954.) DeMontoya did not bring a petition for rehearing to challenge that conclusion. Nor did she file a petition for review with the California Supreme Court. In other words, although she had the opportunity to challenge our determination that DeMontoya did not prove prejudice under the 2018 amendment, she did not do so. Instead, all but ignoring our consideration of the 2018 amendment during her first appeal, DeMontoya, primarily relying on *Ruiz*, simply concludes that she is entitled to seek relief under section 1473.7 anew because of a change in the law.

---

4    The court's conclusion in *Camacho*, *supra*, 32 Cal.App.5th 998 is buttressed by the Legislature's comments. In enacting the 2018 amendment, the Legislature declared among other things that its intent was "to provide clarification to the courts regarding Section 1473.7 . . . to ensure uniformity throughout the state and efficiency in the statute's implementation." (Stats. 2018, ch. 825, § 1(b).)

However, we do not find *Ruiz* instructive here. That case did not address the situation before us in the instant action. In *Ruiz*, the superior court denied the defendant's first motion under section 1473.7 then determined it did not have jurisdiction to hear a second motion under that statute. (See *Ruiz*, *supra*, 49 Cal.App.5th at p. 1065.) The defendant appealed the order denying the second motion, and the appellate court then determined that the superior court erred in not considering the second motion because it was brought after the 2018 amendment to section 1473.7. (*Ruiz*, at pp. 1068-1069.) In contrast, during DeMontoya's appeal of the order denying her first motion, we explicitly considered the impact of the 2018 amendment on DeMontoya's claim of prejudice. As such, the situation the superior court faced in addressing DeMontoya's second motion differed greatly from the circumstances under which the superior court declined to consider the defendant's second motion in *Ruiz*.

Moreover, in considering how the superior court evaluated DeMontoya's claim of prejudice in her first motion, we are not persuaded that the court applied the wrong standard in any event. The court did not discuss prejudice under the *Strickland* standard. Instead, the court correctly indicated the type of prejudice DeMontoya had to prove to succeed under her motion. In denying the motion, the court explained that it found DeMontoya had not " 'presented proof that there [wa]s prejudicial error damaging [her] ability to understand and defend against or knowingly accept the actual or potential adverse immigration consequences.' " That is precisely what the statute requires, even after the 2018 amendment. (See § 1473.7, subd. (a)(1); see *Vivar*, *supra*, 11 Cal.5th at p. 529.)

Nevertheless, DeMontoya glosses over the superior court's explanation and claims that the court applied the *Strickland* standard of prejudice

25

because the court later stated " 'I don't think that there has been evidence presented that there would have been a difference in outcome . . . .' " Thus, based on the phrase "difference in outcome," DeMontoya argues the court was requiring her to show that but for her counsel's errors, there was a reasonable probability that the result of the hearing would have been different. Yet, DeMontoya does not consider the context in which the comments were made. The error at issue was not that DeMontoya's counsel did not inform her of the immigration consequences of her plea. The court explicitly found that DeMontoya was so advised. And, on appeal, we determined that substantial evidence supported the court's factual finding. (See *People v. DeMontoya, supra*, D073954.) The error during DeMontoya's change of plea hearing was that her attorney did not discuss with her that there might have been a possibility to fashion the plea to avoid mandatory immigration consequences (i.e., pleading guilty to assault with a deadly weapon but capping confinement at 364 days). The court clarified that, after stating it was not convinced there would have a been a " 'difference in outcome,' " DeMontoya presented no evidence that the prosecution would have even entertained such an offer. Indeed, the court noted the record suggested otherwise. Thus, the court "needed . . . evidence" of the prosecution's willingness to accept a plea deal that would not have had mandatory immigration consequences. Without such evidence, the court stated that DeMontoya had not shown that her plea would not have been the same. In other words, DeMontoya did not prove that a prejudicial error damaged her ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of her plea. (See § 1473.7, subd. (a)(1).) And, on appeal, we independently

agreed with the superior court's conclusion. (See *People v. DeMontoya, supra,* D073954.)

In addition, DeMontoya's reliance on *Jung, supra,* 59 Cal.App.5th 842 does not change our analysis. There, the appellate court concluded that the defendant's "earlier petitions for writ of habeas corpus, which alleged ineffective assistance of counsel, did not bar [her] from seeking relief under section 1473.7 once she was no longer in criminal custody." (*Id.* at p. 846.) Although the court determined that "[t]he order and findings denying [the defendant's] habeas corpus petitions" had "collateral estoppel or issue preclusion effect as to any identical issue that was actually litigated and necessarily decided," whether the defendant "meaningfully understood or knowingly accepted the adverse immigration consequences of her plea and convictions, and whether she suffered prejudice, were not actually or necessarily determined in the habeas corpus proceedings" because the trial court "denied the petitions solely on the ground that counsel's performance was not deficient and expressly declined to reach the issue of prejudice." (*Ibid.*)

Because the defendant's habeas petition was resolved on the issue that the defendant's counsel was not constitutionally ineffective, it logically follows that the court in *Jung* would conclude that the 2018 amendment to section 1473.7 "made clear that it did not require a finding of ineffective assistance of counsel in order to grant relief." (*Jung, supra,* 59 Cal.App.5th at p. 855.) Consequently, the court reasoned that "[a] motion under section 1473.7 that is based on a ground other than ineffective assistance of counsel is not asserting that same ground for relief alleged in a prior habeas corpus petition." (*Ibid.*) Thus, the court held "denial of Jung's petitions for writ of habeas corpus, which alleged ineffective assistance of counsel, did not

27

collaterally estop her from obtaining relief under section 1473.7 on a different ground." (*Id.* at p. 860.)

Here, unlike the defendant in *Jung*, DeMontoya did not file a petition for writ of habeas corpus alleging a claim of ineffective assistance of counsel. Instead, she filed a motion to vacate her conviction or sentence under section 1473.7. Further, the superior court did not deny DeMontoya's 2018 motion after making a finding under *Strickland*. Rather, the court denied DeMontoya's motion under the standard for prejudice set forth in section 1473.7. And this court affirmed the superior court's order by independently finding that the 2018 amendment to section 1473.7 did not change the analysis or result. (See *People v. DeMontoya, supra*, D073954.) As such, *Jung* does not support DeMontoya's arguments here.

In short, both DeMontoya's 2018 and 2021 motions were made pursuant to section 1473.7. The 2018 amendment did not change the issue to be decided under section 1473.7, subdivision (a)(1). Indeed, this court specifically considered the impact of the 2018 amendment during DeMontoya's first appeal. Accordingly, the two motions presented the "identical issue": Did DeMontoya establish by a preponderance of the evidence that her conviction or sentence was legally invalid due to "prejudicial error damaging [her] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere"? (Stats. 2016, ch. 739, § 1; Stats. 2020, ch. 317, § 5.) The superior court as well as this court answered that question in the negative. Consequently, we conclude that DeMontoya's 2021 motion was not based on new law.

DeMontoya next argues that collateral estoppel does not apply because her mental health issues raised in the 2021 petition were not "actually

28

litigated" in her prior petition. "An issue is actually litigated '[w]hen [it] is *properly raised*, by the pleadings or otherwise, and is submitted for determination, and is *determined . . . .* A determination may be based on a *failure of . . . proof . . . .*' " (*People v. Sims* (1982) 32 Cal.3d 468, 484.) Although " '[a] former judgment is not a collateral estoppel on *issues which might have been raised but were not*; just as clearly, it is a collateral estoppel on issues which were raised, *even though some factual matters or legal arguments which could have been presented were not.*' " (*Mills v. U.S. Bank* (2008) 166 Cal.App.4th 871, 896; *Betyar v. Pierce* (1988) 205 Cal.App.3d 1250, 1254 ["An issue is actually litigated only when it is raised by the pleadings and factually resolved either by proof or failure of proof."].) Here, based on the record before us, we conclude that DeMontoya's mental health was "actually litigated" in her 2018 motion.

DeMontoya submitted her own declaration with her 2018 motion. She did not assert that at the time she entered her plea that she had mental health issues that made her unable to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of her plea. Instead, she stated that an immigration court had found that she was not competent to represent herself in those proceedings based on "a severe mental disability." She declared that she had been diagnosed "with depression, post-traumatic stress disorder, and anxiety." DeMontoya's 2017 psychological evaluation, which was requested by the attorney appointed to represent her in the immigration proceedings, did not address what, if any, impact her mental health issues would have had on her ability to meaningfully understand, defend against, or knowingly accept the actual or potential immigration consequences of her plea. DeMontoya told

29

the psychologist that "[w]hen her lawyer told her to plead guilty 'because if I went to trial, I would go to jail forever,' she agreed."

During argument on DeMontoya's 2018 motion, the court stopped DeMontoya's counsel from discussing DeMontoya's current mental health issues. The court observed that there was no evidence before it that DeMontoya suffered from an "Axis I diagnosis nor was there any psychological report or anything given [to the court] that says at the time of the plea, she was incapable of understanding that she was going to be deported."

After the court made its ruling, it asked DeMontoya's counsel if she wanted to state anything more for the record regarding DeMontoya's "emotional inability or her mental capability understanding at that time." Counsel stated:

> "I think the declaration from her immigration counsel is in the record. She clearly does have some impairments, based on that attorney's declaration, and certainly we can't date those back to the time of this plea, but there is reason to believe that those have been in effect for some time."

Counsel also maintained that DeMontoya's lack of understanding of the difference between a permanent resident and a United States citizen "plays into the question of whether she would have accepted this plea or not, which is the ultimate question."

Thus, it appears that DeMontoya's counsel attempted to raise her mental health as an issue in the 2018 motion but the court rejected her arguments because there was no evidence before it that DeMontoya's mental health prohibited her from meaningfully understanding, defending against, or knowingly accepting the actual or potential adverse immigration consequences of her plea. Indeed, DeMontoya's counsel conceded her client's "impairments" could not be traced back to the time of her plea.

30

By again raising her mental health in her 2021 motion and arguing now that it impaired her at the time of her plea, DeMontoya appears to be trying to avoid collateral estoppel by including additional information about her mental health issues in support of her 2021 motion that she did not raise in her 2018 motion. This is not proper. "An issue decided in a prior proceeding establishes collateral estoppel even if some factual matters or legal theories that could have been presented with respect to that issue were not presented. [Citations.] A prior decision does not establish collateral estoppel, however, on issues that could have been raised and decided in the prior proceeding but were not." (*Bridgeford v. Pacific Health Corp.* (2012) 202 Cal.App.4th 1034, 1042-1043.) Here, the issue of DeMontoya's mental health was "actually litigated" in her 2018 motion. She just did not provide sufficient evidence in support of her first motion to explain to the court how her mental health impacted her ability to understand the consequences of her plea. Having failed to provide the necessary evidence in 2018, she does not get to claim in 2021 that she is providing the court with new facts when she failed to do so regarding the same issue previously. Thus, we conclude that the issue of DeMontoya's mental ability to understand her guilty plea was previously litigated in connection with her first motion under section 1473.7.

DeMontoya does not raise any other arguments regarding the factors required to invoke collateral estoppel. However, she argues, in the alternative, that even if we conclude collateral estoppel applies to her second motion, nonetheless, the superior court erred denying her motion because the policies underlying collateral estoppel must give way to the "Legislative [s]ubjectives of section 1473.7." We reject this contention.

We agree that courts look to the policies underlying the collateral estoppel doctrine before deciding if it should be applied in a particular case.

31

(*Lucido v. Superior Court*, *supra*, 51 Cal.3d at pp. 342-343.) Also, it is true that "the public policies underlying collateral estoppel—preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation—strongly influence whether its application in a particular circumstance would be fair to the parties and constitutes sound judicial policy." (*Id.* at p. 343.) That said, we are not troubled by the superior court's application of collateral estoppel to bar DeMontoya from relitigating her section 1473.7 contention because the same arguments DeMontoya advanced in her second motion were fully and fairly litigated in her first motion.

As we discussed *ante*, the superior court applied the correct standard in denying DeMontoya's 2018 motion. Filing a second motion under section 1473.7 and asking the superior court to conduct the same analysis and come to a different conclusion does not preserve the integrity of the judicial system or promote judicial economy. This is especially true here because we previously determined that the 2018 amendment to section 1473.7, which went into effect while DeMontoya's appeal was pending, did not change the outcome in her case, and thus, we affirmed the denial of her 2018 motion. (See *People v. DeMontoya*, *supra*, D073954.) Consequently, there is no new law on which DeMontoya's second motion is based. And allowing DeMontoya to relitigate her section 1473.7 motion based on additional evidence that could have been presented in support of her earlier motion runs counter to the policies underlying the collateral estoppel doctrine.

In short, the superior court properly determined that DeMontoya was collaterally estopped from relitigating her section 1473.7 motion because the issue in her 2018 and 2021 motions was "identical," the issue was "actually

litigated" in her 2018 motion, and the policy considerations underlying the doctrine support its application in this case.

DISPOSITION

The order is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

AARON, J.

BUCHANAN, J.